The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit, are admonished to draw nigh and give their attention to the court in that sitting. God save the United States and the Honorable Court. Thank you. Good morning. You may be seated. All right. Good morning again. We have two cases today. The first case is number 244502, United States v. Tremayne Hawkins. And we have Mr. Walker and then also Mr. Reed. All right. Thank you. All right. Yes, sir. Mr. Walker, we'll be glad to hear from you. Good morning. Good morning. Mr. Hawkins should prevail because there was no context, no action and no behavior supportive of reasonable suspicion of drug activity in his case sufficient to prolong the traffic stop that he suffered. I'll start with the action. And I think everyone is probably waiting to talk about the so-called or ask questions about the so-called hand-to-hand transaction in this case. I want to point out right up front that the interaction between the gentleman in the parking lot that was under surveillance in this case, Eagle Court apartment complex, there was a Jackie Bird that approached Cornelius Johnson's car and Jackie Bird had a conversation, spoke to the occupants of the vehicle. He didn't engage in a hand-to-hand transaction. It's a hand-to-hand transaction in this case and name only. And I'd like to explain to the court why. Number one, the officer... Actually, do they even see their hands? No. But more importantly, just like the Drakeford case, I mean, I don't think this court has to go far beyond Drakeford in order to rule in favor of Mr. Hawkins. The officer who conducted surveillance, he didn't see an item in any hand. He didn't see cash in any hand. He didn't see any other behavior during this so-called hand-to-hand transaction that was indicative of drug use or a drug transaction. And of course, it's so important to point out when we talk about context that just like in the Drakeford case, this happened in broad daylight. This happened in the middle of a large parking lot where people are coming and going from all the apartments in the area. And also, I think what undercuts this idea that it was a so-called hand-to-hand drug transaction, of course, we know it wasn't because there were no drugs ever found. But what undercuts the claim is that Jackie Bird remained at the vehicle for, I think, two minutes. So that looks more like a greeting. That looks more like a casual conversation. That looks more like people who happen to know each other, which in this case they did. They were relatives. Well, let's stop right there just a minute. Yes, Judge. Yes, Judge. Let's just say, what are we evaluating? Are we evaluating that action or are we evaluating what the officer who made the stop relied on? He says there was a transmission from that guy, right or wrong, to him that we think there was suspicious drug activity and if we can stop him, stop him. How much reliance can that second officer give to what the first officer? It's a tip. It's a reliable tip. Just like in the Critchfield case, I was here a couple of years ago and there was a postal inspector observing certain conduct that was occurring in the community. That postal inspector called... So where does that fall on the sliding scale of probable cause? Well, probable cause is really not in play. In this case, it's reasonable suspicion. But I think that Officer Stanley was permitted to accept this statement from Detective Burke for what it was, that it may have been a hand-to-hand. Officer Burke said he believed there was a hand-to-hand. Officer Stanley can take that into consideration. But a so-called hand-to-hand transaction, just like in Drakeford, even if we take at face value what Burke said, is not sufficient because sometimes a hand-to-hand, like in the Drakeford case, is just a handshake. So this court, other panels of this court, other published opinions of this court, require more than people touching hands or people getting close enough where they potentially could exchange some kind of item. So just like in Drakeford, that alone is not enough. So if we take, if we accept your argument, then we don't have to get into the idea of, we don't have to get into the time plot, whether it's 15 minutes, 30 minutes. The case just ends on your argument that there wasn't enough activity to create a suspicion of a drug activity. Correct. That hand-to-hand alone is certainly not enough. Now, I will concede... Don't we still have to consider the clock? Because even if that's not enough, then we're just looking at the traffic stop itself on the basis of the taillight or the illegal turn, whatever that they saw. Well, here's my response. My response to the clock question is very simple. This is unlike many cases where an officer addresses the mission of the stop, let's say the traffic violation, and then elects to extend the stop beyond that necessary timeframe. Because in this case, Officer Stanley, he didn't take a detour. Sometimes we have cases where the court talks about an officer taking a detour into another investigation. Officer Stanley completely disregarded the original mission of the traffic stop, which was the moving violation. But he informed them of the moving violation. He told them why he pulled them over, but then he almost immediately began his drug investigation. And the best place to see that is the video, in this case, because you can see Officer Stanley takes Mr. Williams out of the car, asks him questions related to the drug investigation. This is all before he issued any kind of warning to Cornelius Johnson for the traffic violation. Then he has Mr. Johnson get out of the car and ask Mr. Johnson for about five minutes on the side of the road. It's all on the dash cam, questions about the drug investigation. So you can see, based on the video and based on the testimony, Officer Stanley skipped. He skipped the investigation that related to the traffic violation, and he nearly immediately began to engage in a drug investigation without reasonable suspicion to do so. So in terms of time, this is really a de minimis case. This is a case where Officer Stanley began to prolong the stop without reasonable suspicion. He didn't do it for hours. It wasn't 50 minutes or an hour and a half. The whole thing just took about 28 minutes, but he did it when he started the drug investigation and nearly disregarded the investigation relating to the traffic violation. How much weight do we give to his testimony, then, that he never gives tickets for that kind of activity? Do you believe that? No, well, I thought that's favorable to you. He's holding it in there. Nobody in this courtroom believes that a patrol officer in Wheeling, West Virginia, who's been doing the work for six years now, plus two since the traffic stop, never gives someone a ticket for a traffic violation. Nobody believes that. No one could believe that. And I challenge my friend on the other side of the V to come up here and tell me that he believes that Officer Stanley never gives anyone a ticket for a traffic violation. What does he do for his job? You're missing the point. I'm trying to help you here. Well, but it is what it is. He's not credible. So it is, but that's what he said. Now, if that were true, why would he be holding them 28 minutes if he wasn't going to give them a ticket in the first place? That's absolutely right. I can't answer that. How do you answer a question that has this false premise? The bottom line is, he had no reason to conduct a drug investigation, and he did. And now the government will argue that, well, Cornelius Johnson was a known drug dealer. In 2014, I mean, at what point is a conviction stale? And I think it's very telling, very telling. Well, I think Drakeford is going to handle that for you. I don't think Drakeford says we can't do it.  The cases don't allow us to reach back that far to find relevance to a conviction. But it's also very telling in this case, which I think is different than Drakeford, that Mr. Johnson was on federal supervised release at the time of the traffic stop. And I think the evidence is, at least the record is, I think, clear, that he didn't violate his supervised release. So this meant the system actually worked. The system is designed to rehabilitate people. Cornelius Johnson was rehabilitated. He was on federal supervised release. He was working. He had never violated his supervised release. He wasn't involved in any crime. And we know that because he didn't violate. So the fact that Cornelius Johnson had this prior, again, it's sort of Detective Burke, as we say in Bush, Virginia, bless his heart. I mean, he's trying to do his work. He's trying to be a drug task force officer. He's trying to be effective. But he had, you know, sort of this bias coming into the situation. He just presumed that Cornelius Johnson was up to no good. He followed him all through town. He presumed that this was a hand-to-hand when there was no evidence that it was a hand-to-hand. And, you know, that's really what we're left with. I want to point out, I think this is really, you know, it's in broad daylight. We talked about that. There's no informant. Even in Drakeford's case, there was an informant who said, that man over there, he's a big drug dealer. We didn't even have that. We didn't have that kind of context. There was no 911 call, no complaint. We don't even have, like, the typical, well, we had been receiving a lot of calls from Eagle Court that month. A lot of complaints in Eagle Court that month about drug activity. I mean, Eagle Court was just sort of neutral. It wasn't a hot spot. I think that's a very important point, that Eagle Court was not a high-crime area. And, again, happened in the middle of the day. There's one other point that I would like to make about the so-called inconsistent statements. Yeah, let me ask you. I was going to ask you about that, because he, of course, I think the government, and we'll hear from the government, is saying, well, there's this inconsistent statement. I think the question was, did you meet anyone at the apartment? And there are two different answers. And so I'm curious to hear your position regarding that as to, if you look at the totality of the circumstances in that, because there's two different answers, then we are in a position of inconsistent statements and thus reasonable suspicion. Right. We have to analyze that. And what I wanted to tell the court is that the inconsistent statements occurred after the drug investigation began. So they could never be a basic so-called inconsistent statement. They weren't inconsistent statements. If you want to call them inconsistent statements, they occurred after the drug investigation began. So the violation of Mr. Hawkins' Fourth Amendment rights occurred prior to the receipt of that information. The government can never rely on the so-called inconsistent statements as a basis for Officer Stanley to conduct a drug investigation because Officer Stanley was conducting the drug investigation before he received the so-called inconsistent statements. But just assuming for a minute that the government will argue that, look, this was all evolving, it was all sort of in real time, and, you know, it's hard to say when the drug investigation- So it's your position that you can't add on to the totality of the circumstances once the investigation has started? It was too late. It was too late. The government- Officer Stanley was required to have reasonable suspicion to conduct a drug investigation before he conducted the drug investigation because it was the drug investigation that prolonged the stop. So we can't take what happened after he began the drug investigation to support the drug investigation itself. But however you look at it, the statements weren't- And I know that's not really laid out clearly in the briefs, but if you look at the video and look at the chronology of it, the inconsistent statements came after the violation. But they were not inconsistent statements, not at all. Williams and Johnson both admitted to being at Eagle Court. They both admitted that they had an interaction with another person. Now we know Jackie Byrd. And they both admitted to having a conversation with Jackie Byrd. The particulars were reported differently to Officer Stanley. But again, Officer Stanley said, what happened at Eagle Court? And that's kind of a general question. So you can get two different responses to a very general question. And both can be true. It can be true that Jackie Byrd wanted a cigarette. It can also be true that Jackie Byrd wanted to talk to Canutus Johnson about a job. And those were the two explanations that were given. So while the particulars may be different, the statements are not in conflict. They are not mutually exclusive. And I will like to note, I just have another minute left, that- And I can't sort of put my finger on the name of the case, but there are cases, published cases from this court, where there are true inconsistent statements. And it's very valid in terms of supporting reasonable suspicion. But what we're seeing is one occupant of a car saying, oh, we didn't go to Greenville, South Carolina. The other occupant of the car said, well, we just came from Greenville, South Carolina. That's very helpful information. You know someone is lying under those circumstances. And that's, again, somewhat of an extrapolation from the cases. But we see cases where occupants are saying things that cannot coexist as two true statements. But that is absolutely not what happened in this case. Both of these gentlemen were telling the truth. They just had different recollections of what happened on Eagle Court. And, I mean, again, sort of for crying out loud, just to be a little colloquial here, both men said they knew Jackie Bird. Both men said they saw Jackie Bird. Both men said Jackie Bird came up to the car. I mean, what more do you want from them on the roadside when they're sort of pulled over? They don't know why they're pulled over. They're potentially nervous. They gave answers that were totally satisfactory. And, again, Officer Stanley is. All right. Thank you. And I think you've reserved some time. Oh, thanks very much. I hope that answers your question, Your Honor. All right. Thank you. Yes, sir. Ms. Reed. Good morning, Your Honors. May it please the Court. My name is Clayton Reed, and I represent the United States in this matter. Your Honors, the totality of the circumstances established Officer Stanley had reasonable suspicion that justified any extension of the stop. And for those reasons, the District Court properly denied his motion to suppress, and their judgment should be affirmed. I'd like to start with there was a lot of talk about Drakeford, so I'd like to start there. Drakeford, Mr. Hawkins relies on Drakeford. The only sort of consistency or fact that is somewhat close is this handshake interaction. But the distinctions are there were several things that were relied on in Drakeford that are not here, that were differences. They had general information from a confidential informant that the court found. There was scant information about that CI's reliability. There was two interactions they thought were consistent with drug transactions, and then no drugs were any found. And then we had this handshake exchange that was believed to be a drug transaction, even though the officer said they did not see anything that was actually exchanged. But even that is different in this case, because in that case we knew there was a handshake. The officers testified to it. They saw it. The only parallel Mr. Hawkins draws here to this being a handshake is because he says it was a handshake. That's what they want the court to believe. Well, isn't that the problem? We don't know what happened when he reached into the car. You can't even say that their hands touched. There's nothing that they observed. In that way, it's similar, Your Honor, in that they did not observe anything change hands. But the – It seems as if you may have had – these officers had less than the officers had in Drakeford. Well, I think what's also different, Your Honor, is that in Drakeford, the court found that the officers overlooked a lot of things that could have diminished the reasonable suspicion inquiry or the – Well, what about Mr. Byrd? I mean, they had an opportunity to speak to Mr. Byrd, right? They did, Your Honor. If we're talking about overlooking, I mean, it just seems like this is – that there is less here than the officers said they had in Drakeford. I think there's vast distinctions between where this took place and what the officers observed and what they did in Drakeford. Because in Drakeford, it was a very public place. Isn't this a parking lot? It's a parking lot, Your Honor, in a apartment complex that's kind of secluded. And it's in daylight. Yes, Your Honor. That's the same. But this was inside a vehicle. In Drakeford, the officer testified how these drug deals usually would go down is people would get into vehicles, exchange drugs. That's what happened here. There was a vehicle involved where you didn't see what actually happened. In Drakeford, it was outside of the vehicle, which the court said that didn't support what the officer had testified you would expect to see in a drug transaction. And then they all went together into a store and began shopping immediately afterwards. Now, Mr. Hawkins was there for a minute or two, but he then left. So the facts and sort of the... He was picked up, correct? I'm sorry, not Mr. Hawkins. Mr. Burke left after this transaction, Your Honor. And it's also different in Drakeford that the officers knew in that case that the individual they were surveilling had some arrests before for drug trafficking. They did not know anything about whether those arrests led to convictions. Where here they did know that there was convictions. They knew the circumstances of that underlying... But why does that matter when they are so long ago? Because what does this mean for people who have past convictions? That every time they go about their ordinary life and they are somehow more suspicious than other individuals? Of course not, Your Honor. It's just a factor in this list of factors that goes into it. If all they knew... Because that's not what happened. They didn't just see... They did not just see Mr. Johnson and say, okay, we know he was previously convicted. Let's stop and see what's going on. But that's what made them start following him from the first location to the second location. That in addition to where they observed him originally. They observed him in an area that they were conducting surveillance because they had drug investigations in that area. Is this a part of town? Is this just a part of town? It was a specific... The 400 block of... I think it was Ontario Street and North Wheeling Island, Your Honor. And Officer Burke testified that he had investigations in that specific block. And that they often conduct surveillance in that area because of all these ongoing investigations in that area. That they could check on different things and sort of over time continue to build their investigations. I'd also like to talk about... Mr. Walker said that Officer Stanley completely disregarded the traffic violation. And that that is clear from the video. And I would completely disagree with that. If we watch the video from the traffic stop. Officer Stanley is diligently pursuing both the traffic stop for traffic violations and his drug investigation. He approaches the car. Then 30 seconds of stopping it. He collects the information of the driver, information on the passengers. He goes back to his car. He calls dispatch with that information. As he's awaiting for dispatch to get back to him, that's when he begins... Once he has some backup, because there's three individuals in the car. Once some other officers arrive, that's when he starts talking to them. But doesn't Stanley testify at a district court that he was always investigating them for the drug activity? I believe he did, Your Honor. And he was. He certainly had that also in the back of his mind.  But to say that he... If the court doesn't... So the district court found that Officer Stanley possessed reasonable suspicion at the time he stopped the car. And so therefore, any extension past that time was okay. Because he had reasonable suspicion. If the court doesn't accept that fact, then I think you do have to, as you alluded to, Judge Giles, talk about, well, was he pursuing the traffic stop as well? And when was there actual extension of that traffic stop? If we're just looking at it based on a traffic stop. So what did he learn when he went to the patrol car and called in the information? What added to the scenario that would cause him to get out of that car and come back? This is a routine traffic stop. Is there something that he was told from dispatch that would cause him to get them out of the car? Because this is just a traffic stop. He was pursuing his drug investigation at that point, Your Honor, but the stop had not been extended at that point. If you watch the video, it's at the 944 mark into the video that dispatch calls him back and tells him that the occupants of that vehicle don't have warrants, everything's valid. So if this were a straight traffic stop, that would be the point in time that he could have concluded that traffic stop. That he could have let everyone go. And so did that occur before he got them out of the car or after? That occurred almost, it was in between talking to Mr. Johnson and talking to Mr. Williams and Mr. Johnson. So he had already gotten, he had already talked to Mr. Williams. Mr. Williams is the driver? Mr. Johnson was the driver, Your Honor. So why do we talk to Mr. Williams when Mr. Johnson's the driver? Well, he had originally talked to Mr. Johnson when he stopped the car, when he's collecting information, where you're coming from. But as he's awaiting confirmation on valid license, valid, you know, if anyone has warrants, then he's following up. He's diligently pursuing both at that point, I would argue, his drug investigation and his traffic stop, which is still ongoing. And so when he talked to Mr. Williams, by the time he could have even stopped that traffic stop and learned that he could have let that car go because no one had any warrants, he had already been lied to by Mr. Williams. Mr. Williams was... What was the lie? Mr. Williams was asked, did you meet anyone at North Park? And he said no. Well, who did he meet? They met Mr. Bird. He didn't mention Mr. Bird? Well, Mr. Bird walked up to the car. I don't know if... I don't know if... How do you characterize that as him meeting, that he went there to meet Mr. Bird? How is that a lie? Your Honor... The question wasn't, did you speak to someone at the apartment? The question wasn't, who was it that came up to your car? If he had said, oh, no one came up to the car, that might be a lie. But it was just an open... And they're in the parking lot of the apartment. Who did you meet at the apartment? He didn't even go in the apartment. So how is that a lie? I think what is relevant, Your Honor, is what the district court pointed out, was that it was reasonable for Officer Stanley in that situation to perceive that he was receiving contradictory information and lies. Okay. Because he didn't mention... Back to that. Back to that. But then once he says, who was the guy that came to the car, he said, oh, yeah, that was Mr. Bird. He came and asked me for a cigarette, right? Yes, Your Honor. Okay. So I guess my problem is, it's the question that you asked, right? And the question that he asked was broad and open-ended. So I could ask you, how was the weather outside when you walked in today? You might say it was windy. Mr. Walker might say it was sunny. Could there not be both? Could it not be windy and sunny? Is that a lie? Just because both of you gave two different answers? No, Your Honor, but I think the question was more direct in that. But if the question was, if I said the question was, was it cloudy outside and one of you said, no, it was sunny, and the other one said it was rainy, then that would be inconsistent. But I think what you all are saying is inconsistent or what the officers are saying is inconsistent to a very broad and open-ended question is not inconsistent. It's just different. It's just different. Both could be true. He may have asked one person for a cigarette and the other one for a job. When we're talking, Your Honor, when we're talking about what answers both individuals gave, I think both could be true. But what is important is, as a district court found, it was reasonable for him to believe that those were inconsistent. And before that even happened, that he was, I think, asked a more direct question of, did you meet anyone up there? And he said, no. He didn't mention Mr. Burr. He didn't even mention picking up Mr. Hawkins. He was phrased as who you met. And to the point, I mean, that is, when you are meeting someone, that's not someone just walking up to a car, you know. That implies something more than something passing. And so the response is not something that would be inconsistent or make it seem like he is trying to hide something. Your Honor, I believe the original question was, did you meet anyone up there? And it was no. And then he said, what about the guy in the red jacket? Because he knew that was not true. And so then he was allowed to sort of elaborate, yes, he just wanted to bum a cigarette. I don't think it was unreasonable to believe that when he didn't mention either Mr. Burr or Mr. Hawkins, to believe that he was trying to conceal that they met with anyone. And then later when he received conflicting stories, to believe that those were conflicting, even though both may have been true, I think the germane question is, was it reasonable to, in his mind at that time, to believe that they were conflicting based on what he was facing? And so to Mr. Walker's point, Your Honor, that, again, if the district court found that Officer Stanley had reasonable suspicion at the very initiation of the traffic stop, if the court doesn't agree with that, by the time that the stop would have been extended at all, by the time that he could have gave that warning and let the car go, he had already had the initial conversation with Mr. Williams, and immediately after that had the conversation with Mr. Johnson. So he had that additional factor of what he was hearing from these individuals. And I don't think... So Mr. Walker's point is that these statements occurred after the drug investigation began. I don't disagree in that. He is conducting a drug investigation that entire time, but it's not at a point after which he extended the traffic stop. The traffic stop was still ongoing when this additional factor came into play. So those statements would factor into, if the court doesn't believe that reasonable suspicion he had at the very beginning of the stop, whether he could then, at that point, extend the stop. What concerns me a little bit is, how does a traffic stop end? How does it end, Your Honor? Yeah. Normally, either with a citation or a warning or however that officer is going to conclude that. And you're suggesting to us that it took 28 minutes to conclude a traffic stop. I'm not, Your Honor. I'm suggesting the earliest point in time that he could have concluded that traffic stop was about 8 minutes and 44 seconds into the stop. It was the time right after he had the discussion with Mr. Williams, right before he had the discussion with Mr. Johnson, that he was told, it's just dash cam video, so we can't see everything, but we can see what's happening. And all we can hear is, if anyone's in the car, we can hear it. And we can hear the radio traffic. And what we hear over the radio traffic is dispatch come back and say negative NCIC, meaning they don't have warrants. That's the point where he's concluded his license checks, his checks for warrants. That's the point, the earliest point that he could have walked up to the car and given the warning and let them go. But at that point, he had everything that was going into the traffic stop and what he had developed during that stop. And so it's at that point that if there was an extension that's impermissible, that the court would have to consider what he had at that time. And at that time, he had the additional factors of talking to those individuals. What about this? I mean, Judge Floyd brought up earlier that he said he never gives traffic violations for the traffic stop. I mean, so what's the purpose of the traffic stop? I'm sorry, Your Honor. He says, I think it's on JA 97. He said, I usually don't ticket for traffic violations. I think he just said he usually gives a verbal warning. Yes. So what was the purpose of any of it other than just saying, hey, your light's out in the back, of asking questions of everyone in the car, and if he's just going to give them a warning that the light's out in the back of the car, what was the purpose of anything beyond that? He said, Your Honor, he was also investigating suspected drug crimes based on what he was told. So then that takes us back to what Mr. Walker says regarding reasonable suspicion as to the investigation of the drug crimes, right? As to the investigation of the drug crimes, if he was delaying this traffic stop, delaying the traffic stop just to investigate drug crimes, just to wait on a K-9, then that is something that we would consider. But my argument is he was not delaying the traffic stop at all. He was diligently pursuing both. And by the time he ever got to the point that he could complete that traffic stop, give his warning, and let them go, he already had the conversation with the two individuals. And it's at that point where he felt he was lied to, where he felt he was giving conflicting stories, that's the time that he called the K-9. That's the point he made the decision, I'm going to – He first asked the quickest way that he could sort of dispel or confirm his suspicions, which was consent. That was denied. The second fastest way he could do that was to get a K-9. So let me back up to your eight minutes. You got me confused now. You said at the eight-minute mark he could have concluded the traffic stop if he had wanted to. We know that he had already talked to at least one of the individuals. I don't know whether he talked to the second. So what did he do after eight minutes other than sit around and wait? He was – I think that's not uncommon, Your Honor, waiting to hear back as far as information on who's in the vehicle. That was occurring. And while he's doing that, rather than just waiting.  You told me at the eight-minute mark he had gotten the all clear on any warrants, et cetera, and he could have concluded the traffic stop at that point. So what did he do after eight minutes to investigate? He then – he got that confirmation after he talked to Mr. Williams. Mr. Johnson was on his way out of the car when that comes through the radio. After that point, he talked to Mr. Johnson briefly for a couple of minutes and called a K-9 after two or three minutes after he was denied consent. So I guess my point being, Your Honor, that he wasn't just sitting around. He wasn't delaying anything to call him the K-9. He hadn't even called a K-9 at that point. I think he was doing what we want police officers to do, is ask questions, see if he can alleviate his concerns before. Well, let's continue your timeline. You said eight minutes, and it took two more minutes to deal with the next individual. That's ten minutes. So at what point after that did he call the K-9? He called the K-9. So he received the information about the warrants at the 944 mark of the traffic stop video, Your Honor. He called to request the K-9 at the 1226 mark. So two and a half minutes, and that is after – while he's conducting the conversation with Mr. Johnson. I see that I'm out of time, Your Honors, unless you all have any other questions. Any other questions? All right, thank you, sir. Yes, sir, Mr. Wall. Thanks very much. I'd just like to read one paragraph from United States v. Foster, 634 F3rd 243, 2011 case. This court wrote, We're deeply concerned, we're deeply troubled by the way in which the government attempts to spin these largely mundane acts into a web of deception. Although these matters generally only come before the court where a police officer uncovers some wrongdoing, we would be remiss if we did not acknowledge that the exclusionary rule is our sole mission of ensuring the police refrain from engaging in the unwarranted harassment or unlawful seizure of anyone, whether he or she is one of the most affluent or the most vulnerable members of our community. Unless this court has any questions, I have nothing further. No, no questions. All right, thank you. Thank you very much. All right, we will just, Giles and I will come down and shake your hand. And if you all walk up and shake Judge Boyd's hand.
judges: DeAndrea Gist Benjamin, Henry F. Floyd, Patricia Tolliver Giles